Good morning. The next case on the calendar is Jose Carlos Angel-Lopez v. U.S. Attorney General. Ms. McKee and Mr. Robbins. Are you both ready? Yes, Your Honor. Ms. McKee, would you like to say four minutes for rebuttal? Yes, please. All right, perfect. You may proceed. Thank you. My name is Estelle McKee and I represent Petitioner Jose Angel-Lopez. May it please the court. Mr. Angel-Lopez is a young Salvadoran man who has schizophrenia. This means he has a chronic and severe psychosis. He has been deemed incompetent. He has applied for asylum in El Salvador on the ground that he will be forced to undergo electric shock therapy, also known as ECT, without anesthesia. Now, ECT is a treatment in which a patient is strapped to a hospital gurney, an electric helmet placed on their head, and electricity sent through the brain. As it is performed in El Salvador's National Psychiatric Hospital, it is persecution on account of schizophrenia, which would make Mr. Angel-Lopez eligible for asylum. This case is not about the lack of access to medications. It's not about the lack of mental health treatment. It's about the active use of a particularly cruel treatment on individuals suffering from an acute mental illness. It is forced on psychotic patients. It is inflicted without anesthesia. And the immigration judge and the Board of Immigration Appeals, the agency in this case, never addressed this argument. Rather, they cabined this particular argument under the Convention Against Torture. That is an entirely independent claim from asylum. And they denied it on a ground that is valid for the Convention Against Torture, but which has no corollary in asylum. The agency decided that forced ECT without anesthesia would not qualify under the Convention Against Torture because there was no intent to harm the patients. But an intent to harm is not required for asylum. All that is required is that one central reason for the persecution be the protected ground. And in this case, that would be Mr. Angel-Lopez and his schizophrenia. So in failing to consider this argument, the agency also never considered the expert witnesses' evidence in his first declaration, in which he said the National Psychiatric Hospital is the only facility in El Salvador that treats chronic severe psychosis. And based on that, there is at least a 10% chance that Mr. Angel-Lopez would end up there. That particular hospital gets its patients from all over El Salvador. And given Mr. Angel-Lopez's cluster of symptoms, his hallucinations, his delusional thought, his inappropriate responses, and sudden bouts of aggression, he would end up there. But not only that, based on this expert witnesses' testimony or his initial declaration, forced ECT without anesthesia, pardon me, is a, quote, common treatment in the hospital. It is used, quote, often. And this is uncontradicted evidence that the agency never addressed. Further, to the extent the agency did consider the initial declaration, it misconstrued the nexus standard by artificially severing the symptoms from the disease, basically. Because of Mr. Angel-Lopez's schizophrenia, he cannot control his behavior. His behavior is described in the record as bizarre. As I mentioned earlier, he has delusional thoughts, disorganized thinking. He smiles inappropriately. He was unable to provide coherent responses in much of his interview. And if you target the symptoms, then you are targeting the disease. This court decided as much in Azurdia Hernandez versus U.S. Attorney General. And in that case, a cartel targeted the petitioner and his mother because the cartel liked the fact that they were honest. And the cartel thought, well, they wouldn't cheat the cartel. And upon finding out that they were evangelical Christian, the cartel said, all the better, because that means you're less likely to cheat us. Similarly here, and this court found that, this court remanded back to the agency to determine whether that was targeting the petitioner and his mother on account of their religion. Here, the immigration judge and the board of immigration appeals dismissed any conclusion that an attack on Mr. Angel-Lopez would be on account of his schizophrenia. And even if you segregate the symptoms from the disease, the two are so intertwined that there is at least a 10% chance the schizophrenia would be one central reason for his persecution. And that leads me to my next point, which is that the agency misconstrued Mr. Angel's claim as persecution in the form of stigma or economic deprivation. And that is not his claim. His claim is that he will be attacked either by the highly militarized police force or gangs who patrol almost the entirety of El Salvador. But maybe I read the record incorrectly, but I didn't see any evidence of the government or gangs potentially doing this to other members of the protected class who were suffering from schizophrenia. Your Honor, the evidence that addresses the specific instances of schizophrenia were in the supplemental declaration by the expert witness, which is in the appendix at exhibit H. And in that declaration, the expert witness specifically describes how a person who had inappropriate smiling or laughter would antagonize the police or the military. How a person with schizophrenia who has auditory hallucinations would not be able to respond to police questions or gang orders, and how their cognitive impairments would prevent them from orienting themselves to gang territories. This is in the record at page 256. Further, I would point out that this expert evidence remains uncontradicted, and it's consistent with the Department of State evidence, which describes widespread gang activity and the fact that the government cannot even guarantee freedom of movement because of gang territories. But, Richard, yes, go ahead. Okay. And for these reasons, Mr. Ángel López argues that the agency failed to accord reasoned consideration to his claims. We are not asking this court to decide whether persecution, he has a well-founded fear of persecution. We are asking this court to remand so that the agency actually addresses his argument that he will face forced ECT without anesthesia, and it has at least a 10% chance of that, to apply the nexus standard correctly, and to address the argument, the facts in the supplemental declaration that neither the But you say that the, they never considered this. I want to reference you to the BIA's order, where they say the following in response to the contention that the IJ failed to consider all of the evidence, the affidavit submitted by Sam Nichols, the expert. The BIA writes, and I quote, the immigration judge considered the expert's affidavits, but was not persuaded that the respondent had established that he had a well-founded fear of persecution on account of his membership in a particular social group. The IJ found that the harm described by the experts amounts to discrimination and economic disadvantage, which does not generally rise to the level of persecution. Furthermore, the IJ was not required to adopt the expert's opinion as the ultimate legal conclusion regarding the respondent's burden of proof. Can't we read that to say, particularly where the IJ obviously was aware of the electric shock issue, particularly in the context of that they considered all of it, they just didn't accept your argument in this case, and they didn't accept Nichols' expert opinion on the point that he was likely to be required to undergo electric shock therapy without any anesthesia, although they didn't use the words anesthesia or electric shock in any way. The BIA says he reviewed everything. Your Honor, there are two giveaways that indicate that the immigration court did not review everything, and the first is the immigration court dismissed the expert witness's evidence as not addressing the issue because it only addressed mental illness as a whole. Now, in the expert's initial declaration, that is true. He only addressed mental illness as a whole, but the supplemental declaration was devoted entirely to schizophrenia and Mr. Ángel López's specific symptoms, which are typical of schizophrenia. The second reason is that when the immigration judge addressed the ECT without anesthesia, he never addressed the likelihood or any single element of asylum. He only dismissed it on specific intent, a ground unique to the Convention Against Torture. If your honors have no more questions, then I will wrap up merely by requesting that this court vacate and remand. Ms. McKee, you still have four minutes remaining for rebuttal. Thank you. Mr. Robbins, you may proceed. May it please the court. My name is Jonathan Robbins. I'm here on behalf of the United States Attorney General Merrick Garland, the respondent in this matter. Good morning to all of you. I want to acknowledge at the outset that the government recognizes that this is certainly a very sympathetic case. When an individual suffers from the severe mental condition that petitioner does, in this case, schizophrenia, it's certainly reasonable to be concerned about what will happen to that person if they are removed from the United States to another country that doesn't have the level of medical care that we have here. But when we're talking about the forms of relief that are issued in this case, asylum and withholding of removal, it's important to establish what the law requires in order to establish eligibility for those forms of relief. An individual has to establish a nexus to a statutorily protected ground. I think it's important to explain what that means because the Supreme Court has explained what nexus requirement means. We refer to it in common parlance as the nexus requirement. But the Supreme Court has made clear that what we're really talking about is a motive requirement. The persecutor has to be motivated to harm the individual on account of a statutorily protected ground. And it's not enough that the would-be perpetrator of the harm knows that the individual has the characteristic. They have to care that they have the characteristic. And the reason the agency denied asylum and withholding of removal in this case is because it determined that petitioner did not establish the requisite nexus to a statutorily protected ground. Now, counsel, it seems to me that what the IJ did and the BIA adopted in effect is the IJ discounted all of the harm attributable to the behaviors. And therefore, it seems to me, it seems to me that was pretty obviously improper because the behavior derived directly from the mental illness. And furthermore, our case law, that recent unpublished case that your opponent cited in the 28J, but also our published decision in Perez-Sanchez, excuse my pronunciation, 935 F3rd at 1158, expressly holds that you cannot disentangle behavior similar to this. It seems like to me that is clear error and requires a The cases regarding the entanglement of different motives, those are cases where an individual had established past persecution. So for example, the Perez-Sanchez case, that was a case where the individual had testified as to actual facts that had happened. And what the court found in those cases was that the record compelled a conclusion that the perpetrators of the harm were motivated by more than one different motive and that the evidence compelled that conclusion. We don't have any past persecution in this case. Well, why is it not exactly the same with respect to fear of future persecution when you have the testimony of this expert that seems to me pretty clearly constitutes substantial harm that the IJ and BIA did not consider because they improperly discounted it? Your Honor, I reject the notion that they discounted it. What we have, as I was saying, because we don't have any past harm to the petitioner, what we're doing is we're speculating on what's going to happen in the future. And so I'll give you this hypothetical. Suppose you saw somebody acting erratically in the street, okay? Now you might want to take action to prevent that type of behavior from happening. Now you might think that the person is mentally ill, but maybe not. Maybe you think the person is high on drugs, or maybe you think they're drunk, or maybe you just think they're an oddball and that they're acting oddly because of some other reason. What the motive requirement from the Supreme Court requires is that the persecutor know of the characteristic and care about the characteristic. And so what the agency was saying there is, look, we're speculating about what might happen in the future. And so when you take a look at, for example, the expert's affidavit, when the expert was testifying about what could potentially happen when petitioner is encountered because of his testify or stated in his affidavit, he said, look, I don't have any statistical information that really informs the likelihood of what will happen when somebody with erratic behavior encounters people in the home country. All I really have is anecdotal evidence. So he gives, for example, an anecdotal instance where an individual had encountered gangs, but he doesn't explain what the gangs thought about that person, what erratic behavior was displayed. So what you really have here is a gap in proof. Petitioner, you don't really have a lot of information in this affidavit that informs the analysis as to the likelihood that his erratic behavior will cause him to be persecuted because he has mental illness. I mean, petitioner is effectively asking that to be inferred. He says that there's a stigma in the country and that the court should infer that there is going to be a persecutory motive on account of his mental illness. But the board, I think, reasonably explained that while we understand that's the adverse, that's the inference that he's asking us to make, there's no requirement that we accept that inference in the adverse of actual evidence to support that inference. May I ask you just a quick question? Because the BIA specifically said that for purposes of this decision, they were treating the respondent as part of a cognizable particular social group. Do you agree that someone who is suffering from mental illness is part of a cognizable particular social group? Well, Your Honor, that will, I don't want to speak to it before the board speaks to it. They assumed that it was. So for the purpose of this case, you should assume that it is. In the larger context, academically, whether a social group, that will depend on a number of things. In order to establish a cognizable social group, you would have to demonstrate that it's sufficiently particular and socially distinct. So that may depend on country conditions evidence as to whether the group is recognized in the country. So it might vary from country to country. I know that, you know, there were many groups that were raised in this case. Petitioner raised a group of mental illness combined with erratic behavior. Erratic behavior is a very amorphous thing. I mean, what might be erratic to somebody might not be erratic to another. So I don't know that it would qualify, but I think that's all really academic. I guess, well, it's not academic because if we write an opinion and we say that someone suffering from a mental illness is part of a cognizable social group, are we supposed to drop a footnote in there saying, but it depends on country to country? I mean, what are we supposed to articulate in an opinion? Well, I would just simply say that the board assumed for the purposes of this case that the group was cognizable and that the cognizability of the group is not at issue in this case. I think that, I mean, under Chenery, the court should not be addressing a case on an issue that the board hasn't addressed or the agency hasn't addressed in the first instance. I know that certainly the government is precluded from making arguments in that vein under Chenery. So I think it would just be appropriate to decide the case on the basis of which the board decided and leave it at that. And certainly the agency is allowed to do that. Under Supreme Court law, INS against Pogamos-Bod, courts are only required to resolve a case on any dispositive issue and it doesn't have to reach other dispositive issues if one issue is sufficient to resolve the case. Actually, in this case, the particular social group that was assumed arguendo, as you're saying, by the BIA is schizophrenia with erratic behavior. That seems to me to further cast doubt upon the IJ's divorce of the erratic behavior from the mental illness. I don't think the IJ divorced the erratic behavior, Your Honor. In fact, if you look at the IJ's decision at page, I believe it's 108, the immigration judge is specifically discussing the expert affidavit and he says, the respondent's expert related an anecdote about an individual physically harming a mentally ill man, but from the expert's own anecdote, it is unclear exactly why the individual harmed the man. The expert claims that the harm was on account of the man's mental illness, but the individual may have been annoyed by the man's behavior and neither noted nor cared about the man's mental illness. So what the IJ is explaining there is he's acknowledging the notion that petitioner is claiming that erratic behavior will subject him to harm in the home country. But what he's saying is this anecdotal evidence of one situation, which doesn't tell us the motivations of the people who were harmed, which doesn't really inform the analysis, that's not sufficient to meet your burden of proof to show that your erratic behavior is going to subject you to the level of harm that you're claiming. And I want to address the issue of the electric shock. I don't read it the way you do. I'm reading from page 0004077, the sixth page of the IJ's report. And it says, although respondent argues that he may be harmed if he manifests the symptoms of mental illness in front of someone, respondent has not provided specific facts and details to establish that he would be harmed on account of his mental illness, as opposed to an individual's frustration with his behavior, which could be attributed to other causes, not simply mental illness. That seems pretty clear to me to be divorcing the behavior from the mental illness. I don't think so, your honor, because what they're saying is that he hasn't shown that the, well, there's a number of different claims that petitioners are making. So first he's claiming he could run into just random gangs and that his erratic behavior could subject him to harm from them. So I think what the agency is saying with respect to those particular would-be perpetrators of harm, that there's no indication that they're going to know that he's mentally ill, right? They may be frustrated with his behavior. And I know that may seem like a fine line, but the reason the agency is drawing that line is because that's where the Supreme Court has drawn the line. The Supreme Court has said that this is a motive requirement. And that means that when we're determining what harm falls outside of withholding the removal and asylum, and which harm is going to be covered under that refugee law, we look to what's in the persecutor's know and care. And what he's saying is when you randomly encounter people in the middle of the street, yes, you may be exhibiting erratic behavior, but there's no indication that they're going to be motivated to harm you because they know you have some mental illness or, and certainly there's no evidence in this record that the government is seeking to persecute the mentally ill. Now there's another sort of portion what petitioner's claiming. He's claiming that he's going to be subject to mistreatment in institutions. But what the agency said about that, and it's very the expert affidavit, there's decidedly mixed evidence. So for example, in the affidavit, let me just turn to it here. One of the things that the expert explains is that even though some people are subject to these incidents of abuse, he says, he also says that the hospital had begun to implement better protocols to protect the patients at recently. And he pointed out that he had a personal conversation with your doctor, which noted that informed consent was written up as a guideline and a protocol that had been implemented since then. Now the expert certainly says that there have been problems with the implementation of the policy. In many cases, it hasn't been implemented, but that mitigates against the notion that petitioner is going to be subjected to this particular form of treatment. And I would also point out that there's a lot that has to happen between petitioner being removed and going all the way down the line where he would be subject to this electroshock treatment. You know, one of the things the expert talks about is the in the mental facility are people who either their family have abandoned them or they don't have family members. Petitioner is not in that boat. He testified that he had a somewhat good relationship with his father, that he thought that his father would take him back. So he's not in the same situation as a lot of these people who might be housed in some of these units. Let me ask you more precisely and specifically, what evidence is there to support the proposition that someone who is schizophrenic and had erratic behavior would likely be subject to shock therapy without anesthesia? Is there any evidence in this record to support that proposition, likely to be shocked on account of schizophrenia with erratic behavior? The only evidence that supports that would tend to support that is the expert affidavit, but I wouldn't say that it said that it demonstrate the requisite likelihood. He said that there are incidents where it does happen. But the problem here is what the agency said is that he hasn't established the likelihood of harm. He hasn't met his burden of proof. And there's a lot of mitigating evidence in the actual expert report that cuts against it. Like I said before, a lot of people who are housed in these long term units that are subject to these any family support. Petitioner testified that he thought that his father would take him back if he returned to the country. Petitioner says, even assuming Arduendo that's right, that neither the IJ nor the BIA squarely addressed the question of likelihood to be exposed to shock therapy. There's not a word said about shock therapy in the BIA's order. And the only reference the IJ makes to it is when he discusses CAP. Well, therefore they would have us conclude that neither the BIA nor the IJ gave considered judgment to that particular question, which as I see it is at the core of petitioner's argument. The petitioner says in one line, I'm schizophrenic. I have erratic behavior. If I'm removed back from whence I came, I will likely be exposed to shock therapy. That's persecution on account of a immutable trait, schizophrenia with erratic behavior. Was that considered? And if the answer is yes, what can you point me to in this record that would indicate that? Well, yes, it was considered. And I think your honor actually pointed to some of the evidence yourself in the questioning in the opening. Will you tell me what evidence there is, A, that the IJ considered that. Okay. And B, that the BIA considered it and considered that the IJ in fact considered that. Well, as your honor noted, the immigration was certainly aware of the electroshock argument, not only because he discussed it in the CAT portion of the decision, but I would also point out that during the proceedings, petitioner's testimony, he didn't actually testify that he feared going back because of any mental illness. And what the immigration judge said is to the petitioner's counsel at the time was don't worry about the fact that he didn't testify to it. I've seen the declaration that's been submitted. I understand that this is a mental health claim. I'm going to be assuming that this is the claim and not what he testified to. So the immigration judge, and I would also point out that the immigration judge made clear that he had seen this affidavit many times before because this is an affidavit that had been presented in many other cases. That's also on the record. And so the notion that the immigration judge wasn't aware that electroshock treatment was being claimed here, first of all, he talks about electroshock treatment in the decision. He's clearly fully up to date on what is being claimed in this affidavit. And again, the board acknowledged that he specifically talks about the affidavit in his decision. Now, one of the things in the law, the law doesn't require that the immigration judge articulate every last point. So the law doesn't require that the immigration judge speak about every single point that's made in the declaration. What is required is a showing that he's adequately grasped what the claim is and provided a meaningful explanation as to why he's not denying the claim such that the court can review it. But there's never been a requirement that every single point that is raised is something that is specifically articulated in the decision. I think there's enough here, given the fact that he specifically speaks about electroshock therapy in the decision, and that when he finds that the petitioner hasn't met his burden of proof, that he's entitled to a presumption of regularity that he's read the affidavits and is clear about what is in the affidavits. So I do think there is a sufficient decision here by which the court can be comfortable that the immigration judge was aware of the electroshock treatment issue. I see that I'm out of time. I'm going to ask you a particular question because the IJ did talk about the electroshock therapy, but found that there was no evidence that it was performed with specific intent to harm the patients. Is that the standard? No. In that regard, he was talking about cat protection, because in cat protection, which is not an issue before the court here because it was not exhausted and not waived, there's a specific intent requirement. So what he's discussing there is the lack of specific intent. There's certainly no indication in this record that the government of El Salvador is specifically intends to torture the mentally ill. And really, there's not any evidence that they seek to persecute the mentally ill either. What it shows is that they have substandard medical care to that of the United States. But I would respectfully point out that asylum and withholding of removal is not intended to be a panacea for other countries' deficiencies in medical care. It seems to me you answer that it is clear that the IJ considered the likelihood of electroshock treatment. But you apparently referring to the oral argument. I have read only the decision of the IJ. I do not see there any indication that he considered it except the quick, sparse reference in the torture area. Am I wrong? No. On page 78 of the administrative record, which is page seven of the decision, the immigration judge concludes that the respondent has failed to show that it is more likely that he would be subject to persecution if returned to El Salvador. And so what the immigration judge there is concluding is that he hasn't met his burden of proof to demonstrate the likelihood that he would face the harm there. And the board affirmed that as well. And the record does support that. Petitioner's claim is based mostly on speculation, right? Petitioner's not disputing the agency's finding that there wasn't a pattern and practice of persecution. If somebody establishes a pattern and practice of persecution, then saying that I have this mental illness would be enough to demonstrate the relief. But when you don't establish a pattern and practice, you have to show some type of individualized risk that you'd be singled out for harm. And that's what's missing from petitioner's claim. He's effectively asking for the result of a pattern and practice. He's saying, well, I have this mental illness, so therefore I should just get asylum and withholding of removal. But he hasn't shown any individualized risk, particularly where he testified that he would have the family support that sort of separates him from some of the people that face this harm according to the expert's affidavits. So I do think that there's, I agree with you, maybe some of the conclusions are a bit sparse, but we can tell from the immigration judge's decision that he did consider the electroshock therapy. So the notion that he was unaware of this, to me, simply isn't a plausible reading of the record. So I see I'm well over but if your honors would like me to stop, I would simply thank the courts for its time. Thank you, Mr. Rogers. Thank you. Ms. McKee, you have four minutes remaining for rebuttal. Thank you. Thank you, your honor. Let me ask a question at the outset that maybe you can help me with looking at this record. Is there any record evidence here that someone who's schizophrenic and exhibits erratic behavior will likely be given electroshock therapy? I looked at the Nichols statement. I don't think he went that far, did he? Did I misread that? Your honor, he does not actually give a percentage, but he provides two facts that demonstrate the likelihood. And just as an aside, despite my opponent's assertion regarding the likelihood of ECT, to the extent the court said that he would not more likely than not suffer ECT, that is not the standard for asylum. The standard for asylum is that he has a 10% chance of undergoing forced ECT without anesthesia. But to answer your honor's question, on page 295 of the administrative record, the expert states that only the National Psychiatric Hospital takes inpatients for extended periods, meeting persons with severe, chronic, or serious episodes. They will be transferred to the capital city from around the country. That is Mr. Angel Lopez. So that's step one. For step two, that brings the conclusion home. On page 304, the expert witness states that the treatment is often used without anesthesia and patient consent, that it is frequently used. And given that we're talking about a 10% likelihood, these adjectives do indicate that Mr. Angel Lopez will undergo this treatment. The problem that I'm having is, if we assume for the purpose of my question, that the IJ was fully aware of the issue of shock therapy, among other things, the IJ does not, comes away and says, basically as a general matter, you didn't carry your burden. We have to ask to the extent that's fact finding by the IJ, whether it was so wrong that the evidence in the record compels reversal. That's the language that we use. That's a pretty tall order. And the trouble that I'm having is what you have is you piece together A and maybe B and perhaps C, and you say that yields the conclusion D, that there's a sufficient enough probability that he will be exposed to shock therapy. I think the evidence is debatable on the point, and I don't think it compels reversal. Tell me what I'm missing insofar as I'm applying our standard of review to the conclusions, which are really fact finding at a high order by the IJ. Your Honor, I would argue that the standard of review is not that the record compels reversal. It is de novo, because I do not believe the agency can dispose of its responsibility to address major arguments made by the parties. No, no, I guess I wasn't clear in my question. I want you to assume for the purposes of my question that the record is sufficiently clear that both the IJ and the BIA considered everything in this record, including the argument you made about electric shock therapy. If you start with that assumption, does the record compel reversal to the extent that the IJ finds as a general matter that there isn't sufficient evidence to establish the critical nexus? Yes, Your Honor. To the extent we're talking about likelihood of future persecution, absolutely. Given the two facts that individuals with psychoses, such as Mr. Angel Lopez's, are admitted to the National Psychiatric Hospital and that hospital as its primary treatment, I believe the expert witness indicated that this was the treatment, main treatment used, that he will undergo it, then yes, there is a 10% chance. To the extent Your Honor is talking about nexus, the- Do we find, by the way, in the record, any reference to 10% chance? I know what the standard is, but do we find any effort on the part of the petitioner to factually establish more than 10% here? Do they even use that word? Your Honor, I believe in the Board of Immigration Appeals briefing that was used, definitely in our briefing it was, but- No, no, no. I'm not talking about here. I mean for the critical fact finder, the immigration judge. Was there evidence presented saying there's a 10% chance that if this guy is removed, he will be exposed to electric shock therapy, period? Is Your Honor asking whether the expert witness made a statement to that effect? Yes. Oh, no. I do not believe the expert witness made a legal conclusion, or I guess- No, that's not a legal conclusion. You're right. What I'm asking is whether the expert witness at any point in the course of a very elaborate statement attempted to quantify the probabilities. You see, the problem I'm having is I can't find that. I can't find any effort on the part of Nichols to quantify the probability that he would be exposed, let's say to shock therapy, because that's where you began your argument. And I think if I sat where you sat, I would begin my argument with shock therapy too. But what I'm saying to you is I can't find any probabilistic analysis in the proof offered by the petitioner before the IJ. What the Nichols says is a lot of things can happen to this guy if you send him back, and there are bad things that could happen. I read the IJ to say a lot of bad things could happen, but you haven't met your burden of showing the nexus, that it's sufficiently probable. That doesn't mean more likely than not. It means sufficiently probable, and you flunked out on that basis. That's what the IJ seems to me to be saying. And if that's right, what I need you to tell me is why the evidence presented compels the conclusion that that finding should be reversed. Your Honor, the expert witness does not give a numeric percentage, but nonetheless, this court can infer without such a numeric percentage, based on the facts provided in the initial affidavit and the supplemental affidavit, that there is a well-founded fear of persecution. And I would propose, Your Honor, that the agency cannot meet its responsibility with a broad one-sentence conclusion with no reasoning supporting it. The reasoning supporting the ECT dealt solely with the Convention Against Torture, did not address likelihood, it did not address any specific facts. What you are arguing is that wholly aside from the compel or not compel issue, there was not reasoned consideration of the major factor in the evidence. Exactly so, Your Honor. There is not enough for this court to truly decide whether the agency reached a reasoned decision because of its complete failure to include any reasoning in its denial of asylum based on the arguments raised by the petitioner. Ms. McKee, thank you very much for your argument. Mr. Robbins, thank you very much as well. Have a wonderful day. Thank you. You too, Your Honor. Thank you.